

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 9
JAN 0 9 2001  PM 3: 55

LORETTA G. WHYTE
CLERK

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THE AMERICAN FEDERATION OF STATE,          CIVIL ACTION
COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 17, DAWN E. ALLEN, et al

versus                                     NO.  90-4389
                                             c/w 91-0857
                                             and 91-0858

THE STATE OF LOUISIANA THROUGH             SECTION: E/4
THE DEPARTMENT OF HEALTH AND HOSPITALS

## FINDINGS AND CONCLUSIONS

The following findings of fact and conclusions of law are
hereby entered based upon the record, the evidence presented at the
non-jury trials held on November 8, 1999 and January 21, 2000, and
the law.   At the conclusion of the November 8, 1999 trial, the
liability phase, the Court stated on the record the finding that
plaintiff was due some compensation for uncompensated overtime, but
the amount was uncertain.   The January 21, 2000 trial was directed
to quantum.   The questions tried involved the claim of James
"Dusty" Rhodes, a Sergeant in the Enforcement Division of the

DATE OF ENTRY
JAN 1 0 2001

Fee_____
Process____
X /Dktd____
✓ CtRmDep____
Doc.No.____

Department of Wildlife and Fisheries, for straight-rate and overtime rate compensation in the amount of $ 36,981.00.

Plaintiff Rhodes filed his original complaint seeking recovery for alleged violations of the Fair Labor Standards Act of 1938, as amended ("FLSA"), 12 U.S.C. § 201, *et seq*, against the State of Louisiana for failure to compensate him for overtime hours he worked. Rhodes' original complaint was filed on February 28, 1991, and it was consolidated with two other pending actions asserting the claims of approximately 2000 other state employees for alleged FLSA violations. As a result of a prior trial and judgment on a group of claims, settlements, and dismissals, Rhodes' claim is the only remaining one in these three consolidated civil actions. Rhodes complaint initially when he filed suit was for overtime hours worked in the Game Division. He later amended his complaint to seek overtime for work performed in the Covert Section of the Enforcement Division from the period of August, 1991 until November 5, 1995. The testimony at the trial was directed solely to undercover work performed in the Covert section of the Enforcement Division. Plaintiff indicated he was not pursuing his initial

2

claim for compensation he alleges he is due for work performed while working for the State in the Game Division of Louisiana Department of Wildlife and Fisheries prior to 1991. Thus, the Court finds that he has abandoned his claim for overtime compensation for work performed in the Game Division.

1.

Plaintiff James "Dusty" Rhodes became employed by the Louisiana Department of Wildlife and Fisheries ("DWF") in its Game Division in 1983 and completed the Basic Law Enforcement program at Louisiana State University. He worked in the Game Division from 1983 until 1990, first in the southern part of the Atchafalaya Basin, patrolling 25,000 acres accessible only by water. In 1990, he transferred to the Enforcement Division, went through the Division's Enforcement Academy and was subsequently transferred to the Enforcement Division's Covert Operation section where he worked as a undercover operative from August, 1991 until June, 1996. In June, 1996, plaintiff was reassigned to Enforcement Region 6, where he remains employed.

Plaintiff seeks uncompensated overtime for the period of

3

August, 1991, through November 5, 1995, during the time he worked as a covert operative within the Covert section of the Enforcement Division of DWF.  During this time, Rhodes worked on a number of covert operations, including Operation Plucked Duck, Operation Fender Bender, Operation Bon Apetit, and Operation Gold Key.  It was during Operation Gold Key that plaintiff alleges that he worked the majority of the uncompensated overtime which he claims, although he does seek recovery for overtime work which he performed in 1994 and 1995, but for which he was not compensated.

Operation Gold Key was a long-term, semi-deep cover, rolling store front operation in which Sgt. Rhodes and his supervisor, then Sgt. Larry Matherne (now Lt. Matherne), assumed false identities through the use of fake driver's licenses, commercial fishing licenses, and wholesale/retail dealer's licenses, and credit cards in the false names.  Using these aliases, Rhodes and Matherne purchased and sold game and fish obtained in violation of the fish and game laws through B&T, a fake enterprise set up to conduct this bogus business.  Hidden cameras and microphones were installed in a pickup truck with a refrigerated compartment.  The agents wore

4

hidden micro cassette recorders and recorded hundreds of tapes of conversations.   This operation continued for a period of approximately 2 years, from August, 1991 through July, 1993. During Operation Gold Key, Sgt. Rhodes and Lt. Matherne investigated persons suspected of illegally catching and selling game fish in North Louisiana, including crappie or sac-a-lait, redfish in South Louisiana, deer, squirrels, rabbits, muskrats, raccoons, and eventually controlled substances including marijuana and some methamphetamines.   During these two years working on Operation Gold Key, the plaintiff frequently spent the night away from home and traveled throughout Louisiana, from Vidalia to Venice, to Point-au-Chien and Golden Meadow, over to Lake Charles. He drove to Mississippi at least 20 times during the course of the operation.

During the active part of the investigation, Rhodes would video or audio record the information and place the video and audio tapes in large zipper-top plastic bags, in order to preserve them until the field work was over and the reports had to be written. To prepare the reports, Rhodes would review the logs of the body

wires or telephone wires, view the video, listen to the tapes and read his notes, and then write the reports in longhand at his residence in New Iberia, Louisiana.  A secretary at DWF would type the reports from the handwritten version.  Numerous arrests, referred to as "take-downs", occurred following the undercover operation by Rhodes and Matherne, as well as prosecutions and convictions.  Rhodes testified that he spent 14 weeks in report writing prior to the take down of the operation.

While working in Covert, Sgt. Rhodes worked directly with his immediate supervisor, Lt. Matherne.  Lt. Matherne was exempt from overtime under the FLSA, but Rhodes was non-exempt.  Lt. Matherne's immediate supervisor was Major Thomas Candies, head of the Covert section, who retired from the DWF in 1995.  Major Candies' supervisors were Lt. Col. Charles Clark, Assistant Chief of Law Enforcement, in charge of administrative work, and Col. Winton Vidrine, Chief of Law Enforcement.  The written official policy of the DWF concerning overtime which had been in effect since Rhodes was a cadet was that the agents were not to work overtime.  Agents working in covert, and elsewhere in DWF, were to submit their time

6

sheets for a two week period to their supervisor, who would then initial them and if they indicated 80 hours in a two week period, they would go to payroll.  If the time sheets had any overtime work reflected, they would be sent to Col. Vidrine, whose approval was needed before they could be paid.  It is undisputed that throughout the time period during which plaintiff claims he worked between 2,000 and 3,000 hours of uncompensated overtime, none of the time sheets he submitted indicated that he worked over 80 hours in a two week period.

There was also an unofficial overtime policy akin to an agreement or understanding between Major Candies, Dusty Rhodes and other Covert operatives who worked in the Covert section.  The understanding was that, to work within the parameters of the official absolute policy against paying overtime, and in order to do the job of a Covert operative, which often necessitated working more than 8 hours per day or 40 hours per week, the agent was to do what was necessary to get the job done, but then to "catch-up" by taking off.  Regardless whether the agent was working overtime or "catching-up", he submitted time sheets which showed 80 hours

worked in a two week period.  Thus, the agent could work all 80 hours in the first week of a two week pay period, not work at all during the second week of the pay period, but submit a time sheet showing 40 hours worked the first week and 40 hours worked the second week

Major Candies testified that he had an understanding with all of his operatives in Covert that they would do the job that was necessary, and then use as compensatory time, or k-time, any overtime hours accrued as soon as they could by taking off without using vacation leave or sick leave hours.  Candies stated that was the agreement he had with the plaintiff.  Recognizing that the time sheets would not be accurate in such a system, Major Candies testified that it was an "honor system" and that in his 27 years with the DWF, he never knew of any other officer who had accumulated excessive overtime hours.  He stated that it was each agent's responsibility to ensure that he used his k-time whenever possible and he expected them to manage their time in this manner so as not to accrue excessive overtime.  When Major Candies retired in 1995, he knew nothing of the plaintiff's claim for overtime as

Rhodes did not report to him that he had accumulated thousands of hours of uncompensated overtime.

Col. Vidrine stated that his understanding of the system in place was that he expected that Rhodes would work overtime occasionally, but that he would balance it out in a two week time period.  If the agent was working an operation that called for excess hours, then Vidrine testified that the agent would apply for compensatory or "k" time to his office by submitting a request to his supervisor.

Col. Vidrine testified that the very first notice he had that Sgt. Rhodes was claiming a large amount of uncompensated overtime was in November, 1995, when he had a meeting with Rhodes, Lt. Matherne, and Lt. Col. Clark.  By this time, Major Candies had retired and knew nothing of Rhodes' claim that he had worked 2,000 to 3,000 hours of uncompensated overtime.  Col. Vidrine ordered him to take the month of April, 1996, and then transferred him out of Covert.  Col. Vidrine testified that neither Major Candies nor Lt. Matherne had the authority to enter into a separate overtime agreement with Sgt. Rhodes, that if he had known that Rhodes was

9

working all of these uncompensated overtime hours, he would have ordered it stopped by detailing another agent to work with him. The proper procedure which should have been followed is that if the agent has worked excessive hours the first week of the pay period and realizes during the second week he cannot take off, the agent should contact the supervisor by radio or phone, advise that he is working on the case and cannot stop working, and follow up with a k-time form.  The supervisor, here Major Candies, would sign off on the emergency k-time and attach it to the time sheet.  The k-time slip would have to be signed by Vidrine before payroll could approve it.

In fact, copies of Sgt. Rhodes' pay stubs for 1996 were admitted into evidence and there are spaces at the bottom which indicate totals for Annual Leave, Sick Leave, K-1.5, K-S.T., and LWOP.  K-S.T. was compensatory time to be accrued at one hour for each hour plaintiff worked over 80 in a two week pay period, up to 86 hours, and K-1.5 was compensatory time to be accrued at one and one half hours for each hour plaintiff worked over 86 hours in a

pay period.[1]  These pay stubs were an official means of keeping track of compensatory time, but this method was apparently not used during this time period.[2]  Beginning with plaintiff's April 12, 1996 pay stub, accumulated hours appear in the K-S.T. and K-1.5 columns.

Plaintiff testified that when he joined the Covert section in 1991, he was told by Major Candies to do whatever work needed to complete the job, and then use the excess hours worked as k-time whenever he could.  He presently lives in New Iberia, Louisiana, which is where he lived throughout his tenure in Covert.  During 1991 through 1993, which was the time he worked on Operation Gold Key, he often spent entire weeks, including nights, away from home under an assumed identity, investigating and making cases against 47 individuals who were charged with 107 violations of the fish and game laws of the State of Louisiana.  Of the 47 persons charged in the operation, 42 pled guilty to the charges.  During the

---

[1] LWOP is Leave Without Pay.

[2] Beginning with plaintiff's April 12, 1996 pay stub,  accumulated hours appear in the K.S.T. and K-1.5 columns.  On April 12, 1996, 3 hours are entered in K.S.T.  On April 26, 1996, 38 hours are listed in K.S.T. and 118 hours are listed as taken current and taken year to date.

investigatory period, Rhodes took video and audio tapes, kept daily and vehicle logs and credit card statements, and kept notes. After the field work was completed, Rhodes prepared the case reports at his home in New Iberia.

The plaintiff testified that he spent 14 weeks in report writing in New Iberia on Operation Gold Key before the take-down or arrests of the suspects. Time sheets submitted during this time period indicated that he worked 8 hours per day for 174 days in New Iberia. Plaintiff testified that he worked all of those hours, and many uncompensated overtime hours, in report writing and copying audio tapes for Operation Gold Key. He transferred the audio cassettes to real time recordings, and then made high speed dubs of the tapes. He accumulated over 300 audio tapes during Operation Gold Key. Cledora Rhodes, the plaintiff's wife, testified that the plaintiff often woke at 5:00 a.m. to start the paperwork associated with this operation, worked until midnight, and that the paperwork covered her kitchen table for the duration of this time.

The plaintiff acknowledged that the arrangement he had with Major Candies was that he would be given time off of work with pay,

i.e., k-time, for the overtime hours that he worked. There was no testimony that he was told he would be paid cash for these hours, but that he would be given time off. Indeed, Major Candies believed, when he saw 174 days of work on the plaintiff's time sheets which stated "New Iberia", that plaintiff was "catching-up" by taking time off with pay while at home. Similarly, Major Candies testified that whenever he saw "Luling" entered on Lt. Matherne's time sheets, which is where he lived, he thought Matherne was "catching-up."

Sgt. Rhodes stated that because he and Lt. Matherne were the only covert operatives in Enforcement until 1995 when another agent was assigned to assist them, he was unable to take any k-time during the 1991 through November 5, 1995 time frame. He stated that he worked on one operation after the other, with no opportunity to take any time off and no relief for most of that time. Until November, 1995, however, he never informed or complained to Major Candies about the fact that he was never able to take off and never asked to use his k-time. Rhodes did testify that he took some family trips during this time period, but had to

13

use his vacation leave, since his k-time was "unofficial" and the DWF needed to be able to contact him by pager when he indicated he was working on his time sheets.

Both Lt. Matherne and Major Candies had no doubt that Rhodes had worked overtime hours during his tenure in Enforcement. Col. Vidrine was more skeptical of the overall magnitude of the amount of overtime hours plaintiff claims he worked, but was never compensated for, through k-time or otherwise.

As indicia of the magnitude of overtime which he worked during the years in question, plaintiff introduced into evidence four boxes of files, photograph albums, certificates, credit card receipts, notes, case reports, video tapes and miscellaneous documents containing photographs of the fish and game which were obtained and/or sold in violation of the fish and wildlife laws. Most or all of the case reports for Operation Gold Key are not contained in this evidence because the prosecutions are ongoing on that case and these materials are not in the plaintiff's possession. It is obvious that plaintiff performed a tremendous amount of work to enforce these laws both in acting in a covert

14

capacity, and in acting as a law enforcement officer protecting the chain of evidence for trial purposes, preparing reports to establish cases against the violators, and maintaining the files in connection with these various operations. Plaintiff's two immediate supervisors, Lt. Matherne and Major Candies, had no doubt that plaintiff worked overtime hours while in Covert in these various operations. The Court reiterates its verbal finding that the preponderance of the evidence establishes that plaintiff worked over 80 hours per week at some times during the four year period in question.

2.

Plaintiff Sgt. Rhodes, who is a law enforcement agent, brings his claims for uncompensated overtime work against his employer, the State, under the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. § 201 *et seq*. § 207(a)(1) of the Act provides, in pertinent part:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce,

15

> for a workweek longer than forty hours unless
> such employee receives compensation for his
> employment in excess of the above specified
> hours at a rate not less than one and one-half
> times the regular rate at which he is
> employed.

There is an exception for employees of public agencies engaged
in fire protection or law enforcement activities, as was the
plaintiff, which is contained in 29 U.S.C. § 207(k), as follows:

> No public agency shall be deemed to have
> violated subsection (a) of this section with
> respect to the employment of any employee in
> fire protection activities or any employee in
> law enforcement activities . . . if--
>      (1) in a work period of 28 consecutive
> days the employee receives for tours of duty
> which in the aggregate exceed the lesser of
> (A) 216 hours, or (B) the average number of
> hours (as determined by the Secretary pursuant
> to section 6(c)(3) of the Fair Labor Standards
> Amendments of 1974) in tours of duty of
> employees engaged in such activities in work
> periods of 28 consecutive days in calendar
> year 1975; or
>      (2) in the case of such an employee to
> whom a work period of at least 7 but less than
> 28 days applies, in his work period the
> employee receives for tours of duty which in
> the aggregate exceed a number of hours which
> bears the same ratio to the number of
> consecutive days in his work period as 216 (or
> if lower, the number of hours referred to in
> clause (B) of paragraph (1)) bears to 28 days,

16

> compensation at a rate not less than one and
> one-half times the regular rate at which he is
> employed.

While at first blush the meaning of § 207(k) is obscure, both plaintiff and the State of Louisiana agree that, if any overtime compensation or compensatory time is due to the plaintiff, it is at a straight time rate for hours worked from 80 to 86 in a two week pay period, and at time and a half for all hours worked over 86 in a two week time period.

There is a provision in the FLSA which allows the State to give compensatory time or k-time off in lieu of paying overtime wages. This provision, 29 U.S.C. § 207(o), states in pertinent part:

> (1) Employees of a public agency which is
> a State, a political subdivision of a State,
> or an interstate governmental agency may
> receive, in accordance with this subsection
> and in lieu of overtime compensation,
> compensatory time off at a rate not less than
> one and one-half hours for each hour of
> employment for which overtime compensation is
> required by this section.
>
> (2) A public agency may provide
> compensatory time under paragraph (1) only--
> (A) pursuant to--

17

> (i) applicable provisions of a collective bargaining agreement, memorandum of understanding, or any other agreement between the public agency and representatives of such employees; or
> (ii) in the case of employees not covered by subclause (i), an agreement or understanding arrived at between the employer and employee before the performance of the work; and
> (B) if the employee has not accrued compensatory time in excess of the limit applicable to the employee prescribed in paragraph (3).

Paragraph 3 of § 207(*o*) allows employees engaged in public safety activities, such as law enforcement, to accumulate 480 hours of compensatory time, after which the employee must be paid overtime compensation.  Paragraph (5) of § 207(*o*) provides that:

> An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency--
> (A) who has accrued compensatory time off authorized to be provided under paragraph (1), and
> (B) who has requested the use of such compensatory time,
> shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

18

The evidence establishes that plaintiff did not request the use of his compensatory time until thousands of hours of it had accumulated.  He testified that the reason for this delay was that after Operation Gold Key terminated, during which the majority of the overtime was earned, he had to spend a significant amount of time dictating and preparing case reports.  After that task was completed, another large operation commenced.  He stated that he was assigned so much work that he was unable to use his compensatory time.

3.

After reviewing the totality of the evidence, it is apparent that finding that the plaintiff performed some overtime work is an easy decision.  The evidence introduced at trial supports the plaintiff's testimony that he performed a significant amount of work for DWF during his tenure in Covert.

Quantifying the amount of overtime and fashioning a remedy for the plaintiff, however, is a much more difficult task.  The plaintiff seeks a total of $ 36,981.60 in overtime, of which $ 5,994.78 is for the first six hours over 80 in a time period, to

19

be paid at straight time, i.e., Rhodes' regular hourly rate, and $ 30,986.82, for all hours exceeding 86 worked in a two week time period, to be compensated at time and a half, i.e., 1.5 times Rhodes' regular hourly rate. From 1995 through 1995, plaintiff claims that he worked a total of 2,298 overtime hours for which he was never compensated.

As reflected in Plaintiff's Exhibit B1, for 1991, plaintiff seeks $ 383.04 for 42 straight time overtime hours, reflecting an hourly rate of $ 9.12 and $ 2,658.74 for 195.5 hours at time and half. The total 1991 claim is $ 3,041.78 for 237.50 hours of overtime, averaging 9.13 hours per two-week pay period in which regular hours worked are 80. For 1992, plaintiff seeks $ 1,448.34 for 138 straight time overtime hours, reflecting an hourly rate of $ 10.50, and $ 8,796.99 for 564 time and half hours. The total 1992 claim is $ 10,245.33 for 702 overtime hours, averaging 27 hours per two week time period in which plaintiff worked 80 hours at regular time. For 1993, plaintiff seeks $ 948.48 for 84 straight time overtime hours, reflecting an hourly rate of $ 11.29, and $ 3,215.30 for 186 time and half hours. The total 1993 claim

20

is $ 4,093.94 for 270 hours of overtime, averaging 10.38 hours for a two week pay period during which plaintiff worked 80 hours at straight time.   For 1994, plaintiff seeks $ 1,659.72 for 137 straight time overtime hours, reflecting an hourly rate of $ 12.11, and $ 8,152.49. The total 1994 claim is $ 9,812.41 for 580 hours of overtime, averaging 22.31 hours of overtime after plaintiff worked 80 hours.   For 1995, plaintiff seeks $ 1,555.20 for 120 straight time overtime hours, reflecting an hourly rate of $ 12.96, and $ 7,552.00 for 388.5 time and one half hours.   The total 1995 claim is $ 9,107.20 for 508.50 hours of overtime, averaging 19.56 hours of overtime after plaintiff worked 80 hours at his regular rate in two weeks.  As previously noted, plaintiff seeks a total of $ 36,981.60, of which $ 5,994.78 is for 521 straight time overtime hours and $ 30,986.82 is for time and one half hours worked in excess of 86 hours per pay period.

If a normal work year includes 52 weeks of work at 40 hours per week, each agent would be paid for 2,080 hours of work each year.   Assuming plaintiff's rate of pay in 1991 was $ 9.12 per hour, his normal annual pay would have been $ 18,869.60.  In 1992,

21

assuming his rate of pay was $10.50 per hour, his normal annual pay would have been $ 21,840.00.  In 1993, assuming his rate of pay was $ 11.29 per hour, his normal annual pay would have been $ 23,483.80.  In 1994, assuming his rate of pay was $ 12.11 per hour, his normal annual pay would have been $ 25,188.80.  In 1995, assuming his rate of pay was $ 12.96 per hour, his normal annual pay would have been $ 26,956.80.  In this action, plaintiff seeks to recover in overtime pay over $ 10,000.00 more than his annual pay for any year that he worked in Enforcement, and twice his normal annual pay in 1991.

Because plaintiff never recorded on his official time sheets that he worked over 80 hours in a two week pay period, he documented these hours with other sources at trial.  He referred to certain contemporaneously kept time records, which included his daily log, his vehicle log, his time sheets, his expense accounts, and his case reports, to support his claim.  Unfortunately, despite the fact that plaintiff was a meticulous record keeper with respect to the cases he was preparing, his work record keeping habits were difficult to decipher and inadequate in some respects.  He did keep

22

daily logs, which are black covered monthly minder calendars. Obviously, the plaintiff's task of establishing the exact number of overtime hours worked, and the court's task of quantifying same would have been made immeasurably simpler, and more accurate, if plaintiff had merely marked down his starting and stopping times each day. Such entries in the daily logs for 1991, 1992, 1993, 1994, and 1995 are few and far between.

Plaintiff, an accomplished record builder in the cases he investigated and prepared as a WLF agent, according to his own testimony, was aware that he was supposed to be keeping track of his overtime hours so that he could later use them as compensatory time off. What he bases his overtime request on are Daily Logs, which provide poor documentation of his time for the most part, Case Reports, sporadic Vehicle Logs, and Expense Accounts. The Case Reports contain narratives of the interactions the plaintiff and Sgt. Matherne had with the various persons they were investigating, which predominantly are summaries of the conversations they had with witnesses and persons under investigation. While in some instances the Case Reports mention

23

specific times, the only documentation as to the time worked by plaintiff they provide is the fact that plaintiff was on duty at the time he taped the conversation.  For example, in Case Report 94-03-836F, Operation Bon Apetit, there is report dated September 26, 1994 which details a conversation between plaintiff and a Mrs. Carol on July 12, 1994 about some spotted sea trout.  The report states in pertinent part:

> On July 12, 1994 at approximately
> Lt. Larry Matherne and I, Sgt. James D. Rhodes
> approached Mrs. Carol at La Cuisine restaurant
> to try and sell approximately thirty seven
> (37) pounds of spotted sea trout.

The actual time was left blank on the Case Report.  A yellow post-it note is attached to the report containing the handwritten words "Need time  11:50 A.M." While the end of the conversation is not recorded, from the content of the report it does not appear that the conversation lasted more than 15 minutes.  The plaintiff's daily log entry is completely blank for July 12, 1994.  In his Synopsis of overtime hours worked, the entry for that date shows that the supporting documentation include his Time Sheets, Expense Reports and Case Reports for 94-03-836F BW-1, and 836G BW-1.

24

Synopsis of Plaintiff's Review of his Contemporaneously Kept Records; Plaintiff's Exhibit B1. Plaintiff never listed overtime worked on his Time Sheet, so there is no documentation there that he worked over 8 hours on that day. Case Report 836F is listed above and indicates one conversation that day beginning at 11:15 a.m. Case Report 836G BW-1 contains a summary of a conversation Lt. Matherne and the plaintiff had on July 12, 1994 at 1:16 P.M. with a woman named Malinda at a Vietnamese Market at 1440 Peltier Drive, New Orleans, Louisiana concerning the possible purchase of some sea trout. There is no time indicated as to when the conversation ended, but it could be inferred that it lasted about 20 minutes.

On July 12, 1994, Plaintiff's Synopsis indicates that he worked 12 hours that day. During the two week time period from July 4, 1994 and July 17, 1994, plaintiff had four days off and one holiday (July 4, 1994), for which he was paid for 8 hours. On three days during this time period, plaintiff indicates that he worked 8 hours. On the other six work days, plaintiff represents that he worked 10 hours (7/6/94), 16 hours (7/7/94), 21 hours

25

(7/8/94), 13 hours (7/13/94), 12 hours (7/12/94), and 10 hours (7/17/94). In this two week time period, which included 9 work days and one holiday, plaintiff seeks recovery for 36 hours of overtime work in addition to 80 hours regular time work for which he has already been compensated. The only daily log entries during this two week time period were on July 4, 1994, on which the words "Holiday" were written, and July 6, 1994, on which the words "install Winton's office" were written.

During the pay period from May 23, 1994 through June 5, 1994, plaintiff's Synopsis indicates that he worked 93 hours during this two week time period, which also included 8 hours of holiday pay. During the first five days of this pay period, plaintiff indicates that on May 23, 1994, he worked 10 hours, but his documentation includes his Time Sheets, which indicate only 8 hours worked per day, Daily Logs, which have no entries, and his Vehicle Log. The Vehicle Log sheet indicates on May 23, 1994, he drove 210 miles. It does not otherwise indicate when he started to work and when he stopped working. Plaintiff claims that he worked 12 hours on May 26, 1994, but his vehicle log indicates no miles charged to work

26

that day, the Daily Log is blank, the Time Sheet indicates 8 hours, and the Expense Report shows that he sought and received reimbursement for 11 meals for the period between 5/23/94 and 6/5/94 and two nights of lodging.  The Expense Report does indicate that on May 26, 1994, plaintiff left New Iberia at 6:00 a.m and traveled to Monroe, which is a fair distance.  It does not show his arrival time.  The Vehicle Log is not consistent with the expense report because it indicates that he drove 315 miles on May 25, 1994 and 295 miles on May 27, 1994, but has no entry for May 26, 1994.

The Court reviewed plaintiff's records carefully to establish the method by which plaintiff quantifies his claim for overtime compensation.   It is apparent from the Court's review of the documentation and indeed from the plaintiff's own testimony that his quantification of overtime compensation is reconstructed from various documents and that he did not, on a daily basis throughout these four years, mark down when he commenced working for the day and when he concluded working for the day.  Despite admittedly being told to "keep up" with his overtime hours, plaintiff did not contemporaneously write down starting and stopping times, and has

27

based the instant tally of hours he worked from 1991 through 1995

on his memory, log books which are blank for the most part, vehicle

logs which indicate mileage driven, but not hours worked, and

expense reports which indicates meals for which reimbursement is

due, places traveled to, and reimbursable lodging expenses.  While

the method used by plaintiff to reconstruct these records has some

reliability, it is not what the Court would expect from a law

enforcement officer, who is in effect a trained, professional

record-keeper.  However, the Court finds from the testimony and

documents which have been admitted that plaintiff did work overtime

for which he was not compensated.

4.

Section 16(b) of the FLSA provides a cause of action for

employees to recover unpaid overtime compensation under the statute

from their employers, plus liquidated damages, attorneys fees and

costs.  29 U.S.C. § 216(b).  Th plaintiff has the burden of proving

that he performed work for which he was not compensated in

accordance with the FLSA.  The method by which the plaintiff may

discharge that burden is reviewed in <u>Anderson v. Mt. Clemens</u>

28

<u>Pottery Co.</u>, 328 U.S. 680, 66 S.Ct. 1187 (1946), as follows:

> The remedial nature of [the FLSA] and the
> great public policy which it embodies,
> however, militate against making that burden
> an impossible hurdle for the employee. Due
> regard must be given to the fact that it is
> the employer who has the duty under § 11(c) of
> the Act to keep proper records of wages, hours
> and other conditions and practices of
> employment and who is in position to know and
> to produce the most probative facts concerning
> the nature and amount of work performed.
> Employees seldom keep such records themselves;
> even if they do, the records may be and
> frequently are untrustworthy. It is in this
> setting that a proper and fair standard must
> be erected for the employee to meet in
> carrying out his burden of proof.
>
> When the employer has kept proper and accurate
> records the employee may easily discharge his
> burden by securing the production of those
> records. But where the employer's records are
> inaccurate or inadequate and the employee
> cannot offer convincing substitutes a more
> difficult problem arises. The solution,
> however, is not to penalize the employee by
> denying him recovery on the ground that he is
> unable to prove the precise extent of
> uncompensated work. Such a result would place
> a premium on an employer's failure to keep
> proper records in conformity with his
> statutory duty; it would allow the employer to
> keep the benefits of an employee's labors
> without paying due compensation as
> contemplated by the Fair Labor Standards Act.
> In such a situation we hold that an employee

has carried out his burden if he proves that
he has in fact performed work for which he was
improperly compensated and if he produces
sufficient evidence to show the amount and
extent of that work as a matter of just and
reasonable inference.  The burden then shifts
to the employer to come forward with evidence
of the precise amount of work performed or
with evidence to negative the reasonableness
of the inference to be drawn from the
employee's evidence.  If the employer fails to
produce such evidence, the court may then
award damages to the employee, even though the
result be only approximate.

The employer cannot be heard to complain that
the damages lack the exactness and precision
of measurement that would be possible had he
kept records in accordance with the
requirements of § 11 of the Act.  And even
where the lack of accurate records grows out
of a bona fide mistake as whether certain
activities or non-activities constitute work,
the employer, having received the benefits of
such work, cannot object to the payment for
the work on the most accurate basis possible
under the circumstances.  Nor is such a result
to be condemned by the rule that precludes the
recovery of uncertain and speculative damages.
That rule applies only to situations where the
fact of damage is itself uncertain.  But here
we are assuming that the employee has proved
that he has performed work and has not been
paid in accordance with the statute.  The
damage is therefore certain.  The uncertainty
lies only in the amount of damages arising
from the statutory violation by the employer.
In such a case 'it would be a perversion of

30

> fundamental principles of justice to deny all
> relief to the injured person, and thereby
> relieve the wrongdoer from making any amend
> for his acts.' It is enough under these
> circumstances if there is a basis for a
> reasonable inference as to the extent of the
> damages.

66 S.Ct. at 1192-1193 [citations omitted].

Thus, to recover on a claim for uncompensated overtime, an employee must prove that he worked overtime hours without compensation and he must establish the amount and extent of the overtime work as a matter of just and reasonable inference. Id.

The plaintiff must also prove under 29 U.S.C. § 207(a)(1), that he was "employed" by the defendant/employer. The word "employ" is defined in 29 U.S.C. § 203(g) means to "suffer or permit to work", which has been interpreted to mean that the work was done with the knowledge of the employer. Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986). The Davis court interpreted the statute, and the Mt. Clemens Pottery case, to impose the following burden of proof:

> Therefore, in order to prove he is "employed"
> for purposes of the Act, it is necessary for a
> plaintiff to show that his employer had
> knowledge, either actual or constructive, of

31

his overtime work.  The case law uniformly supports this proposition.  *See Forrester v. Roth's IGA Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981); *Swanson v. Westfield News Advertiser*, 26 Wage & Hour Cas. (BNA) 918, 920 (D. Mass. 1983) . . . .

We do not believe as appellant urges that the *Mt. Clemens Pottery* case requires us to reach a different result.  *Mt. Clemens Pottery* was squarely directed at the issue of what evidence an employee must introduce to establish the extent of his overtime work when his employer has kept inadequate records.  328 U.S. at 687-88, 66 S.Ct. at 1192-93.  Employer knowledge was not at issue in that case since the employer unquestionably knew that its time clock system was causing its employees to record less time than they were actually working.  Nothing in *Mt. Clemens Pottery* or in the Act itself treats the lack of employer knowledge as an affirmative defense to be raised and proved by the employer.  The Act requires the plaintiff to prove that he was "employed" by the defendant, and that means proof that the defendant know or should have known that the plaintiff was working overtime for the employer.  This element of constructive or actual knowledge is especially significant in a case such as this one, in which an employee deliberately acted in such a way to prevent his employer from acquiring knowledge of his alleged uncompensated overtime hours.  *See Forrester,* 646 F.2d at 414-15.

792 F.2d at 1276-1277.

Applying these principles to the plaintiff's situation, the Court finds that plaintiff has established that he worked overtime hours without compensation, i.e., that he has suffered damage under the FLSA.  He has also presented evidence that his supervisors, Lt. Matherne and Major Candies, both knew that he was working overtime in Covert, principally during Operation Gold Key, and approved it being worked.  Lt. Matherne worked directly with the plaintiff as a law enforcement partner.  Major Candies explicitly told the plaintiff that he should work however many hours needed to do the job, but then that he should "catch up" by taking off unscheduled leave as compensatory time whenever he could.  It is likely that this system was used because the DWF had a strict policy against overtime, which had to be balanced against the fact that undercover operations, by their very nature, often require an extensive amount of overtime work.

While Major Candies knew that plaintiff was working uncompensated overtime, the work that plaintiff was performing as a Covert operative was necessarily away from the Department and out of the sight of his supervisors.  The supervisors relied on the

33

"honor system."   Major Candies knew explicitly that plaintiff was
working overtime, but submitting time sheets that reflected only 8
hours per day.   Colonel Vidrine, the head of the Enforcement
Division knew nothing of the arrangement, but the persons to whom
he delegated the responsibility of supervising the plaintiff,
Matherne and Candies, did know that plaintiff was working overtime
for which he was not being compensated, that his time sheets were
not an accurate reflection of the hours he was working, and
instructed the plaintiff to keep his own records and use his
overtime as compensatory time whenever possible.   After having so
instructed the plaintiff, Major Candies never requested an
accounting of the plaintiff's hours, despite the fact that
plaintiff was working in Covert, almost exclusively working away
from the office, and he did not know exactly when plaintiff began
working and stopped working for the day.

Under these circumstances, it was not the plaintiff who
deliberately prevented his employer from knowing what his hours
were or mislead his employer, but the employer, through Major
Candies, who directed plaintiff to use this rather loose "honor"

system.

The pitfalls with this system are exemplified in this case. Major Candies and Lt. Matherne have no doubt that plaintiff worked many overtime hours, and the evidence adduced likewise convinces the Court that the job being performed by the plaintiff, i.e., enforcing the game and fish laws of the state of Louisiana, necessitated the plaintiff work overtime. Plaintiff's employer, a government entity and subject to strict budgetary restrictions, had an absolute no overtime policy. The mid-level supervisor, who was trying to ensure that the laws were enforced, was caught between the no overtime policy and accomplishing results with a minimum expenditure of salary. Major Candies allowed the plaintiff to use this unofficial compensatory time system to meet the needs of the department, but unfortunately, did not properly supervise the plaintiff's use of his uncompensated overtime as compensatory time. Indeed, Major Candies retired from the DWF without knowing that plaintiff had a claim for a large amount of overtime.

Under these circumstances, the Court finds that the plaintiff was "employed" within the meaning of Davis. His direct supervisors

35

knew that he was working overtime and instructed him to keep track of his hours and use them as compensatory time when he could. The purposes of the FLSA, as described in Mt. Clemens Pottery, would be completely thwarted by allowing the State to reap the benefits of plaintiff's work and refuse to compensate him for his labor, when that was the system Major Candies directed him to use. The fact that Colonel Vidrine did not know about the system was not the plaintiff's fault.

By the same token, the Court is not persuaded that the plaintiff's recapitulation of his hours is completely reliable. The Court has painstakingly studied the plaintiff's specific detailed request for overtime compensation, the back-up documentation admitted in evidence to support the number of hours claimed, and the multitude of evidence documenting the fact that plaintiff did work a substantial number of hours over the course of a number of years on the various undercover operations being conducted in the Covert section of DWF. After careful review, and considering the standards of proof set forth in Mt. Clemens Pottery and Davis, the Court finds that the plaintiff has proven, by means

36

of a just and reasonable inference, which was not rebutted by the defendant, that from 1991 through 1995, he worked 521 hours of unpaid overtime, to be paid at a straight time rate, totaling $ 5,944.78, and 888.50 hours of unpaid overtime, to be paid at a time and one-half rate, totaling $ 15,493.41, which represents 50% of the claimed amount of time and one-half unpaid overtime.  The Court finds by a preponderance of evidence that plaintiff has established a claim under the FLSA for unpaid overtime compensation and has proven that he is entitled to recover $ 21,438.19 in actual damages, plus reasonable attorneys' fees and costs.

The Court reaches these findings after study not only of Mt. Clemons Pottery and Davis, but also Newton v. City of Henderson, 47 F.3d 746 (5th Cir. 1995).  In Newton, an undercover police officer for the City of Henderson, sued for overtime compensation under the FLSA claiming he routinely worked overtime without listing it on his time sheet and without authorization by his employer.  He contended that his supervisors had constructive knowledge of his overtime work because he reported his activities to them daily and based upon their backgrounds as former undercover agents, they had

37

to know that he was working outside of his regularly scheduled hours because of the nature of undercover work.  In <u>Newton</u>, as contrasted with the present case, the undercover agent was explicitly advised **not** to work overtime.  Here, the testimony by Major Candies was that plaintiff was instructed to work whatever hours it took to get the job done, including implicitly working overtime.  Plaintiff Rhodes' supervisors had direct knowledge that he was working overtime, as he was instructed to do so.  Newton's supervisors ordered him not to work overtime.

The <u>Newton</u> court found that constructive knowledge of overtime work could not be imputed to the City, observing:

> In light of the fact that Freeman explicitly ordered Newton not to work overtime and in light of the fact that Newton admits he never demanded payment for overtime already worked, it is clear that access to information regarding the Task Force's activities, standing alone, is insufficient to support the conclusion that the City should have known that Newton was working overtime.

47 F.3d at 749.

The <u>Newton</u> court did find significant the fact that Newton's supervisor expected that Newton would use up any overtime hours as

38

compensatory time off, and that it was reasonable for him to expect that he did that.  Here, given the heavy, constant work schedule of the plaintiff, and the fact that no relief was provided to the plaintiff until 1995, the Court cannot find that it was reasonable for Major Candies to believe that all of the plaintiff's overtime hours were taken as compensatory time, or at the very least, it was unreasonable for Major Candies not to supervise the plaintiff's overtime accumulation and compensatory time usage over this period of time.  *Accord*, Reich v. Department of Conservation and Natural Resources, State of Alabama, 28 F.3d 1076, 1083 (11th Cir. 1994)("[A]n employer is not relieved of the duty to inquire into the conditions prevailing in his business" 'because the extent of the business may preclude his personal supervision, and compel reliance on subordinates.'" Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 512 (5th Cir. 1969)).

The State urges the Court to find that it is exempt from paying overtime compensation to the plaintiff under § 13(b)(1) of the FLSA.  This particular FLSA section provides that overtime compensation shall not apply to "any employee with respect to whom

39

the Secretary of Transportation has power to establish
qualifications and maximum hours of service pursuant to the
provisions of Section 204 of the Motor Carrier Act of 1935." 29
C.F.R. § 782.2(b) details the persons who fall within the FLSA
exemption as:

> (2) . . .[T]hose employees and those only
> whose work involves engagement in activities
> consisting wholly or in part of a class of
> work which is defined (i) as that of a driver,
> driver's helper, loader, or mechanic, **and** (ii)
> as directly affecting the safety of operation
> of motor vehicles on the public highways in
> transportation in interstate or foreign
> commerce within the meaning of the Motor
> Carrier Act. [citations omitted].  Although
> the Supreme Court recognized that the special
> knowledge and experience required to determine
> what classifications of work affects safety of
> operation of interstate motor carriers was
> applied by the Commission, it has made it
> clear that the determination whether or not an
> individual employee is within any such
> classification is to be determined by judicial
> process. [citations omitted].  In determining
> whether an employee falls within such an
> exempt category, neither the name given to his
> position nor that given to the work he does is
> controlling [citations omitted]; what is
> controlling is the character of the activities
> involved in the performance of his job.
>
> (3) As a general rule, if the bona fide duties
> of the job performed by the employee are in

fact such that he is (or, in the case of a
member of a group of drivers, driver's
helpers, loaders, or mechanics employed by a
common carrier and engaged in safety-affecting
occupations, that he is likely to be) called
upon in the ordinary course of his work to
perform, either regularly or from time to
time, safety-affecting activities of the
character described in paragraph (b)(2) of
this paragraph, he comes within the exemption
in all workweeks when he is employed at such
job.   This general rule assumes that the
activities involved in the continuing duties
of the job in all such workweeks will include
activities which have been determined to
**affect directly the safety of operation of
motor vehicles on the public highways in
transportation in interstate commerce.**  Where
this is the case, the rule applies regardless
of the proportion of the employee's time or of
his activities which is actually devoted to
such safety-affecting work in the particular
workweek, and the exemption will be applicable
even in a workweek when the employee happens
to perform no work directly affecting "safety
of operation."  On the other hand, **where the
continuing duties of the employee's job have
no substantial direct effect on such safety of
operation or where such safety-affecting
activities are so trivial, casual, and
insignificant as to be de minimis, the
exemption will not apply to him in any
workweek so long as there is no change in
duties.** [citations omitted].

29 C.F.R. § 782.2 (emphasis added).

The plaintiff's duties in his job were primarily law

41

enforcement related.  He worked as an undercover operative for the State of Louisiana DWF by conducting investigations of persons suspected of violating the fish and game laws.  During the course of this job, the DWF set up a bogus business which to the suspected targets pretended to buy and sell fish and game, and whatever other contraband the targets wished to sell.  This job entailed traveling the entirety of the State of Louisiana in a refrigerated truck which had a hidden camera and audio recorder secreted in it. Occasionally, this job also required that the plaintiff drive into Mississippi with the contraband.

The State claims that because plaintiff occasionally drove to the State of Mississippi and pretended to be a legitimate seller or purchaser of illegally caught fish and game, he fell within the exemption of a driver carrying goods in interstate commerce.  The Court disagrees with the State's interpretation of the exemption. The State was plainly not using the plaintiff to engage in the driving of good for purposes of *interstate commerce*, but as a means of law enforcement, i.e., to catch fish and game law violators. The State was not actually in the business of buying and selling

42

fish and game, but was merely using this business as a ruse to capture those violating the laws.  The fact that plaintiff may have, in the course of his covert operations, driven to Mississippi with some fish or game does not convert the plaintiff into a driver engaged in the transportation of goods for interstate commerce under 29 C.F. R. § 782.2.  The Code of Federal Regulations explicitly intend that the character of the activities involved in the performance of the claimant's job control the applicability of the exemption. 29 C.F.R. § 782.2(b)(2).  The character of the job activities performed by plaintiff were law enforcement related and were not for the purposes of interstate commerce.  It is only incidental or insignificant that his job required him to drive his vehicle or to carry fish or game into another state.  None of the jurisprudence cited by the State in support of this exemption involves a factual scenario similar to the present one.

Finally, the State argues that paying additional compensation to the plaintiff for the work he performed from 1991 through 1995 is a violation of the Article 7, § 14, of the Louisiana Constitution of 1974, which has been interpreted to mean that

43

employees of the State may only be compensated on a *quid pro quo* basis, i.e, they must provide fair value for payment for their services and cannot be paid bonuses for work for which they have already been paid.  This is inapposite to this situation, where the plaintiff's claim is that he has in fact performed many hours of work for which he was not previously compensated.

5.

It is not apparent, on the basis of plaintiff's proposed Findings of Fact and Conclusions of Law, whether plaintiff is pursuing a claim for liquidated damages for a willful violation of the FLSA under 29 U.S.C. § 216 and for prejudgment interest. Prejudgment interest is not available for FLSA claims under 29 U.S.C. § 216, but only for injunction claims under 29 U.S.C. § 217. Cox v. Brookshire Grocery Co., 919 F.2d 354, 357 (5th Cir. 1990); Knowlton v. Greenwood Independent School District, 957 F.2d 1172, 1182 (5th Cir. 1992).

An employer who is found liable for overtime compensation under § 216 of the FLSA shall be liable for an additional equal amount of actual damage as liquidated damages.  Reich v. Tiller

44

Helicopter Services, Inc., 8 F.3d 1018, 1030 (5th Cir. 1993). The

Portal-to-Portal Act, 29 U.S.C. § 260 supplies an exception to the

liquidated damages rule of 29 U.S.C. § 216, providing:

> [I]f the employer shows to the satisfaction of
> the court that the act or omission giving rise
> to such action was in good faith and that he
> had reasonable grounds for believing that his
> act or omission was not a violation of the
> Fair Labor Standards Act of 1938, as amended,
> the court may, in its sound discretion, award
> no liquidated damages or award any amount
> thereof not to exceed the amount specified in
> section 216 of this title.

29 U.S.C. § 260. The district court is prohibited from exercising

its discretionary authority to reduce or eliminate the liquidated

damage award unless the employer sustains its substantial burden of

proving that its failure to comply with the statute was in good

faith and predicated upon reasonable grounds. Tiller Helicopter

Services, 8 F.3d at 1031; Bernard v. IBP, Inc. of Nebraska, 154

F.3d 259, 267 (5th Cir. 1998). The Bernard court reinforces the

remedial nature of the FLSA by recognizing that even if the

employer sustains its substantial burden of proving that its

actions were in good faith and based on reasonable grounds, the

court has discretion to award liquidated damages. 154 F.3d at 267.

45

Upon reflection of the entirety of the evidence, the Court finds that the State, through the DWF, was in good faith in denying plaintiff's claim for overtime compensation, but was negligent and therefore less than reasonable in its handling of the claim. Since the plaintiff's own supervisor, Major Candies admitted he authorized the plaintiff to work overtime if needed to perform the job and to use the overtime hours as compensatory time, the DWF had little cause to deny that plaintiff actually worked those hours. Plaintiff's direct supervisor, Lt. Matherne, similarly had no doubt that plaintiff worked many overtime hours. These two supervisors were in the best position to know whether, in fact, plaintiff had worked overtime for which he was not compensated. This is not mitigated by the fact that Major Candies thought that the plaintiff was managing his overtime hours by using them as compensatory time because he admitted that he did not supervise the plaintiff's use of compensatory time, nor did he even ask for any type of accounting of those hours. Under these circumstances, the Court finds that the plaintiff is entitled to an award of liquidated damages under 29 U.S.C. § 260 in an amount equal to the actual

46

damage award.

## Conclusion

For the above and foregoing reasons, the Court finds that plaintiff James D. Rhodes performed overtime work as an employee of the State of Louisiana, Department of Wildlife and Fisheries, Covert Section, for which he was not compensated in accordance with the Fair Labor Standards Act. Rhodes established his claim for overtime compensation under the FLSA, and its interpretive jurisprudence, Mt. Clemens Pottery and Davis, and is entitled to recover the total sum of $ 21,438.19, plus liquidated damages in the equal sum of $ 21,438.19, with reasonable attorney's fees and costs, and interest from the date of entry of judgment.

All other claims in these three consolidated actions having been dismissed and/or otherwise adjudicated, these actions should be marked closed.

New Orleans, Louisiana, January ___9___, 2001.


MARCEL LIVAUDAIS, JR.
United States District Judge